**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, as securities intermediary for LIMA ACQUISITION LP, | No. 3:14-cv-01398 (WWE) |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| PHL VARIABLE INSURANCE COMPANY and PHOENIX LIFE INSURANCE COMPANY, | |
| Defendants. | |

**AMENDED COMPLAINT**

Plaintiff U.S. Bank National Association, as securities intermediary for Lima Acquisition

LP ("Plaintiff"), by and through its attorneys, Paul, Weiss, Rifkind, Wharton & Garrison LLP

and Wiggin and Dana LLP, files this Amended Complaint against defendants PHL Variable

Insurance Company ("PHL") and Phoenix Life Insurance Company ("PLIC," and with PHL,

"Phoenix" or "Defendants"), and alleges as follows:

**NATURE OF THE ACTION**

1.      Plaintiff brings this action seeking compensatory and punitive damages, equitable

and declaratory relief, and attorneys' fees based on Phoenix's unlawful increases of the cost of

insurance ("COI") rates on a targeted group of its in-force Phoenix Accumulator Universal Life

("PAUL") insurance policies, including those held by Plaintiff.  Phoenix's misconduct amounts

to breaches of contract and other wrongdoing, including unlawful rate discrimination, and

unlawful, misleading and unfair practices in connection with its sales of universal life insurance.

2.       Universal life insurance, such as Phoenix's PAUL policies, is a form of permanent life insurance also known as "flexible premium" adjustable life insurance.  Unlike whole life insurance, which requires fixed monthly premium payments, universal life insurance allows policyholders to pay as much money as they want into their policy account (subject to certain limitations), and, each month, the account accrues interest as provided under the policy.  Various charges and fees are deducted from the policy account, including a "COI charge" that reflects the price that the insurance company charges for the actual insurance component of the policy—*i.e.*, the cost for Phoenix to bear the mortality risk with respect to the insured under the policy.  Although no fixed monthly premium payment is due under the policy, if the balance in the account is insufficient to cover the policy charges, including the COI charge, the policy will enter a grace period and lapse unless additional premiums are paid.

3.       Universal life insurance is designed to give policyholders flexibility, in terms of both the payment of premiums and the adjustment of death benefits.  With respect to premium payments, policyholders can pay more into their account if they wish to accumulate tax-deferred interest, or they can pay just enough to cover their monthly policy charges if they wish to invest their funds elsewhere.  Universal life insurance is less expensive than whole life insurance because there is no guaranteed fixed rate of growth on funds in the policy account and no guaranteed fixed death benefit.  The rate of growth and death benefit may vary based on a number of factors, including how the policyholder funds the account, the interest rate under the policy (which is a variable rate), and the policy charges.

4.       Although universal life insurance permits an insurer to adjust the COI rates (by an increase or a decrease), Plaintiff's policies only allow Phoenix to change COI rates based on certain specific factors, the most important of which is a change in Phoenix's expectation of

2

future mortality.  As is well-known in the life insurance industry, however, since the time

Phoenix issued Plaintiff's policies a number of years ago, mortality rates have ***improved***, not

***worsened***, and this has resulted in new life insurance mortality tables that would, if anything,

support a ***decrease*** in COI rates.  Despite this fact, Phoenix has instead attempted to ***increase***

COI rates in blatant breach of its obligations under the policies.

5.    To make matters worse, Phoenix has based its COI rate increases not on life

expectancy, but rather on the policyholder's account value, which is a function of how much

premium the policyholder chooses to pay into the policy.  A policyholder's account value,

however, is not a permissible basis for raising COI rates.

6.    Indeed, upon information and belief, Phoenix raised the COI rates to induce, in its

own words, "shock lapses" by policyholders.  That is, Phoenix raised the COI rates to make

some policies so expensive that policyholders would be shocked into lapsing or surrendering

their policies to Phoenix, so Phoenix could escape its obligations to pay the death benefits owed

under the policies.  In fact, Phoenix timed its COI rate increases to maximize its premium

revenue before inducing such "shock lapses."  As a result, if Phoenix's unlawful scheme

succeeds, Phoenix will never have to pay hundreds of millions, if not billions, of dollars in death

benefits on those policies, after having already collected millions of dollars in premiums on

them.

7.    Phoenix's COI rate increases are also discriminatory.  Policy provisions, and

applicable law, prohibit discrimination in rates within a class of insureds.  Upon information and

belief, at policy inception, Phoenix divided insureds into classes that shared certain

characteristics (*e.g.*, age or gender) or were otherwise correlated with life expectancy.  When

Phoenix increased its COI rates, however, it disregarded the existing classes and created new

classes which were designed to discriminate against policyholders who chose to pay only enough premiums to cover their policy charges and not use the savings (or "cash accumulation") feature of their policies—even if the insureds under those policies bear the same risk profile. This discrimination, in and of itself, is unfair and unlawful.

8.      Phoenix's conduct is also especially egregious given that Phoenix, in selling these policies, stressed the flexibility that policyholders would have in determining whether (and to what extent) they wished to take advantage of the investment features of the policies. Thus, Phoenix represented that the policies would allow policyholders "to lower premiums, as well as adjust the amount and timing of premium payments," and would afford policyholders "increased choice and policy design flexibility to meet [their] needs." Similarly, Phoenix sold its PAUL policies as insurance "designed to balance protection and cash accumulation with features suited to meet policyholders' evolving personal or business planning needs."

9.      Having thereby lured policyholders into purchasing such policies, once policyholders in fact adjusted "the amount and timing of premium payments" to fund their accounts simply to cover their policy charges, as they were expressly allowed to do, Phoenix improperly raised the COI rates on these policyholders. Further, when it did so, Phoenix did not even make clear the amount of the increase or how it would be applied, or provide any contractual, factual, or documentary basis for its increase of the COI rates.

10.      Phoenix's misconduct constitutes express breaches of Plaintiff's policies, as well as breaches of the implied covenant of good faith and fair dealing and unlawful, unfair, and deceptive business practices. Plaintiff therefore brings this action seeking compensatory and punitive damages, as well as equitable and declaratory relief and attorneys' fees.

## THE PARTIES

11.     Plaintiff U.S. Bank National Association is a national banking association with its principal place of business in Ohio, and is the securities intermediary for Lima Acquisition LP.

12.     Upon information and belief, Defendant PHL is a Connecticut corporation with its principal place of business in Hartford, Connecticut.  PHL is authorized to do business in the State of Connecticut and regularly conducts its business in the State of Connecticut, including within this judicial district.

13.     Upon information and belief, Defendant PLIC is a New York corporation with its principal place of business in Hartford, Connecticut.  PLIC is authorized to do business in the State of Connecticut and regularly conducts its business in the State of Connecticut, including within this judicial district.  PLIC is the indirect parent of Defendant PHL.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the action involves parties of diverse citizenship, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over Phoenix because Phoenix is found in this judicial district and because Phoenix conducts and transacts business in this district.

16.     Venue is proper pursuant to 28 U.S.C. §§ 1391(a)(1), (a)(2), and (b) because Phoenix conducts business in this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district, including Phoenix's increase of the COI rates on the policies that are the subject of this Complaint.

## FACTUAL BACKGROUND

**A.      Plaintiff Acquires the Policies**

17.      Plaintiff is the owner and beneficiary of 115 PAUL policies (the "Policies") that were issued by Phoenix between 2005 and 2008.  One hundred and eleven (111) of the Policies were issued by Defendant PHL (the "PHL Policies") in California, Michigan, Minnesota, Texas, and Wisconsin.  The remaining four Policies (the "PLIC Policies") were issued by Defendant PLIC in New York.  The Policies are listed on the attached Exhibit 1.  An example of one of the PHL Policies is attached hereto as Exhibit 2, and an example of one of the PLIC Policies is attached hereto as Exhibit 3.  Both examples have been redacted for privacy reasons.

18.      As is typical of universal life insurance policies, the Policies provide that they will remain in force as long as there are sufficient funds in the policy account each month to cover certain monthly deductions described in the Policies.  The monthly deductions consist of various charges (*e.g.*, a sales charge, issue charge, and service charge), including a COI charge.  Any balance in the policy account that is left after the deductions are taken reflects the "policy value," which accrues interest as provided for under the Policies.  If in any month there are insufficient funds in the account to cover the deductions, the policy will enter a grace period.  If additional premiums are not paid within the grace period, Phoenix will terminate, or lapse, the policy.

19.      The largest and most significant charge under the Policies is the COI charge.  This charge, also known as the mortality charge, reflects the price that Phoenix charges to cover the risk of paying the amount it would have to pay upon a mortality event (*i.e.*, the "death benefit," which is the net amount at risk).  The COI charge is determined by multiplying the COI rate by the net amount at risk.

20.     The COI rates under a policy are initially based on certain underwriting

characteristics of the insured, including her or his gender, age, and risk classification (*i.e.*,

smoker or non-smoker).  The applicable rate increases every year as the insured ages.

21.     The Policies allow Phoenix to change the applicable COI rates, but its ability to

do so is subject to several strict limitations.  Specifically, the PHL Policies provide that:

> [Cost of Insurance] rates will be based on our expectations of
> future mortality, persistency, investment earnings, expense
> experience, capital and reserve requirements, and tax assumptions.
>
> . . . . We review our Cost of Insurance rates periodically, and may
> re-determine Cost of Insurance rates at such time on a basis that
> does not discriminate unfairly within any class of insureds.  Any
> change in rates will be determined prospectively.  We will not
> distribute past gains or recoup prior losses, if any, by changing the
> rates.

(Exhibit 2 at 12.)

22.     Accordingly, under the clear language of the PHL Policies, any change in the COI

rates can only be based on a change in PHL's expectations of future mortality, persistency,

investment earnings, expense experience, capital and reserve requirements, and tax assumptions.

23.     The PLIC Policies contain substantially similar language, which provides:

> No more frequently than once per year and no less frequently than
> once every five years, We will review the monthly Cost of
> Insurance Rates to determine if these rates should be changed.
> However, the rates will never exceed the Guaranteed Maximum
> Cost of Insurance Rates shown on the Schedule Pages.  Our right
> to change rates also is subject to the following terms:
>
> 1.  Any change in rates will be made on a uniform basis for all
>     insureds in the same class.  No change in rates will occur due
>     to any change in the Insured's health or occupation.
>
> 2.  Any change in rates will be determined prospectively.  We will
>     not distribute past gains or recoup prior losses, if any, by
>     changing the rates.

3.  Any change in rates will be based on a change in Our expectations of future investment earnings, mortality, persistency and expense/administrative costs.

4.  Any change in rates will comply with any procedures and standards that may be on file with the insurance official of the jurisdiction where this policy is delivered.

(Exhibit 3 at 11.)

24.  Thus, the PLIC Policies explicitly state that any change in the COI rates can only be based on a change in PLIC's expectations of future mortality, persistency, investment earnings, and expense/administrative costs.

25.  Notably, none of the Policies allows Phoenix to consider a policyholder's accumulated policy value or funding level in setting COI rates.  Moreover, the PHL Policies are also clear that any change in the COI rates may not "discriminate unfairly" among all insureds in the same class.  Similarly, the PLIC Policies provide that any change in COI rates "will be made on a uniform basis for all insureds in the same class."  Both the PHL and PLIC Policies further state that COI rates cannot be changed to recoup Phoenix's prior losses.

**B.    Phoenix Designs and Sells the Policies As "Flexible Premium" Policies**

26.  Phoenix designed and sold PAUL policies as "flexible premium" policies that would appeal to people who sought a competitive return for their assets, wished to minimize their long-term life insurance expenses, and needed flexibility to adjust their policies to their changing needs.  Indeed, Phoenix touted the flexible-premium benefits of its PAUL policies in the very language of the Policies.  Thus, in the Policies themselves, PHL expressly represented that PAUL policies provide for "Flexible Premiums" (Ex. 2 at 1), and also stated that:

a.    "The *actual premiums paid* will affect the Policy Value, the duration of insurance coverage, and the amount of Death Benefit . . . ."  (*id.* at 3 (emphasis added));

8

b.      "The term 'Planned Premium' means the premium that is selected in the application *or as later changed by you* for this policy that you intend to be pay [sic] on a regular modal basis." (*id.* at 8 (emphasis added)); and

c.      "No insurance under this policy will take effect until our underwriters approve issuance of this policy and the conditions specified in the application form have been satisfied, including our receipt of *at least the Minimum Initial Premium* [the amount covering the applicant's up-front costs]." (*Id.* at 13 (emphasis added).)

27.     In addition, the PHL Policies provided a five-year no-lapse guarantee as long as the policyholder made premium payments at a set amount for the five-year period—even if that amount resulted in a policy account value *lower* than the minimum COI charges on the policy. (Ex. 2 at 3, 11, 14.)  By including this feature, PHL intended to make its PAUL policies more attractive to policyholders who would seek to take advantage of their right to minimally fund their policies.

28.     Similarly, PLIC described each PLIC Policy as a "FLEXIBLE PREMIUM LIFE INSURANCE POLICY" (Ex. 3 at 1) and stated that:

a.      "The amount and time of premium payments following the [inception of the policy] are *flexible*." (*id.* at Schedule Page 1 (emphasis added)); and

b.      "*You may generally pay premiums when and in the amount You choose* provided sufficient premium is paid to maintain the policy In Force.  The amount and timing of premium payments will affect the accumulation of Policy Value." (*id.* at Summary (emphasis added).)

29.     Furthermore, in marketing and selling PAUL policies, Phoenix represented that:

a.      Phoenix's universal life products give policyholders the "opportunity to lower premiums, as well as adjust the amount and timing of premium payments."  (Press Release dated April 3, 2006);

b.      Phoenix's universal life products are "designed to balance protection and cash accumulation with features suited to meet policyholders' evolving personal or business planning needs."  (Press Release dated April 3, 2006);

c.      Phoenix's universal life products "offer increased choice and policy design flexibility to meet the needs of the high net worth."  (Press Release dated June 19, 2003); and

d.      Phoenix's universal life products are "appropriate for those looking to minimize long term insurance costs while seeking competitive returns."  (Press Release dated June 19, 2003).

30.      Phoenix's universal life products were also marketed under the trademark "Phoenix Accumulator UL," which Phoenix describes in its U.S. Patent & Trademark Office registration dated February 25, 2003 as "Underwriting and administration of single life universal insurance policies featuring flexible premiums and adjustable-death-benefits."

31.      Phoenix made the representations described above continuously in the Policies and its marketing and sales materials, including in and after 2011.

32.      Based on the language of the Policies, Phoenix's rates, and other representations, Lima LS plc, the general partner of Lima Acquisition LP, purchased the ownership interests in the Policies in the secondary market for life insurance and began making premium payments through Plaintiff, who holds the Policies as securities intermediary for Lima Acquisition LP.  As

expressly permitted under the Policies, Plaintiff has generally paid only the minimum monthly charges.

**C.    Phoenix Initiates Project X To Raise COI Rates**

33.    In 2008, Phoenix began suffering serious financial difficulties as a result of the national economic crisis.  These losses were described in the 2008 annual report of its parent, The Phoenix Companies, Inc., which stated:

> The value of our investment portfolio has declined which has resulted in, and may continue to result in, higher realized and/or unrealized losses.  For example, in 2008 the value of our ***general account investments decreased by $1.3 billion***, before offsets, due to net unrealized losses on investments.  A widening of credit spreads, such as the market has experienced recently, increases the net unrealized loss position of our investment portfolio and may ultimately result in increased realized losses.  The value of our investment portfolio can also be affected by illiquidity and by changes in assumptions or inputs we use in estimating fair value. Further, certain types of securities in our investment portfolio, such as ***asset-backed securities supported by residential and commercial mortgages, have been disproportionately affected***. Continued adverse capital market conditions could result in further realized and/or unrealized losses.  (Emphasis added.)

34.    By the close of 2008, according to its 2008 annual report, The Phoenix Companies, Inc. reported a loss of nearly ***$1.5 billion*** in shareholder equity—from $2.279 billion in 2007 to $865 million in 2008.

35.    Upon information and belief, in the midst of these staggering losses, Phoenix initiated "Project X," which was a highly confidential project to raise COI rates on all PAUL policies, and was to be disclosed only on a "need to know" basis.

36.    Phoenix did not implement the COI rate increases immediately—because, upon information and belief, Phoenix would have had to tell policyholders that their rates would be going up.  Such an announcement would have put a fast halt to Phoenix's sales of policies.

Accordingly, instead of announcing its planned rate increases, upon information and belief,

Phoenix began issuing fraudulent policy illustrations (*i.e.*, policy statements that describe how a

policy will perform in the future) that falsely illustrated a policy's future performance based on

COI rates that were higher than the policyholder's actual COI rates.  Because policyholders

determine how much premium to pay based on these illustrations, Phoenix's fraudulent

illustrations had the same effect as raising COI rates, but without disclosing an increase in rates.

Upon information and belief, Phoenix began issuing these false illustrations in 2009 and

continued to do so at least into 2011.

**D.     Phoenix Raises COI Rates on the PLIC Policies and Other PAUL Policies in 2010**

37.     Approximately two years after initiating Project X, in or about 2010, Phoenix

began sending letters to policyholders notifying them that Phoenix was, in fact, raising the COI

rates on their policies, including the PLIC Policies.  These letters advised policyholders that if

they did not maintain sufficient "accumulated policy values," their COI rates would go up.  In

other words, Phoenix told policyholders that if they did not ***overfund*** their policies with premium

payments, thereby maintaining a positive policy value (which would also have the effect of

reducing the amount that Phoenix would have to pay upon a mortality event, *i.e.*, the net amount

at risk), Phoenix would penalize them by increasing their COI rates.  An example of these letters

is attached hereto as Exhibit 4.

38.     Phoenix's letters did not tell policyholders how much the increase would be or

what accumulated value would trigger a policy increase, but simply threatened, "Should your

accumulated policy value fall below a certain level, the amount of the increase will vary based

on the accumulated amount of your policy value.  In general, maintaining higher levels of policy

value in relation to the face amount will reduce or even eliminate any increase."  Phoenix also

did not identify any factors that supported an increase in the COI rates or explain how it had

determined that an increase in the rates could be justified given the recent decreases in mortality.

**E.      State Insurance Regulators Determine That Phoenix's 2010 COI Rate
         Increases Violated the Policy Terms and Insurance Laws**

39.     After implementing the 2010 COI rate increases, many Phoenix policyholders

complained about the increases to their state insurance regulators.  After investigating Phoenix's

2010 COI rate increases and justifications, the California Department of Insurance ("CDOI"), the

Wisconsin Office of the Commissioner of Insurance ("WOCI"), and the New York Department

of Financial Services (formerly, the New York Insurance Department) ("NYDFS") all

determined that Phoenix's 2010 COI rate increases directly contravened the terms and conditions

of the policies as well as their respective state insurance laws.  As noted above, the PLIC Policies

were initially subject to this unlawful 2010 COI rate increase.  Although the remaining 111 PHL

Policies (for reasons Phoenix has never explained) were not affected by the 2010 rate increase,

66 of those Policies were issued in California, and 16 of them were issued in Wisconsin.

40.     On June 21, 2013, the CDOI found that "the [2010] rate increase is unfairly

discriminatory in violation of California Insurance Code section 790.03f," which forbids "unfair

discrimination between individuals of the same class and equal expectation of life," and "violates

the express terms of the []PAUL policy" since the rate increase was not based on the factors

enumerated in the policy.  The CDOI directed that "PHL should cease using the 2010 COI rating

methodology and ensure that its future rating practices are in complaince with the California

Insurance Code."  A copy of the CDOI's June 21, 2013 letter is attached hereto as <u>Exhibit 5</u>.

41.     Similarly, on April 30, 2013, the WOCI issued a Notice of Hearing to PHL in

which it stated that "[b]y increasing the COI rates only on those policyholders who exercise their

right to maintain lower accumulated policy values, [PHL's] COI rate increase unfairly

discriminates among policyholders of the same class" in violation of Wisconsin Stat.

§ 628.34(3), which prohibits unfair discrimination between individuals of the same class and

equal expectation of life in rates charged. The WOCI also found that the policies were not

written in "commonly understood language" so as to properly inform policyholders that

"accumulation values will be used to determine COI rate increases." A copy of the WOCI's

Notice of Hearing is attached hereto as Exhibit 6.

  42. On September 6, 2011, the NYDFS likewise determined that PLIC's COI rate

increases were illegal because PLIC had based its 2010 COI rate increases on a policy's

"accumulated value." A copy of the NYDFS's September 6, 2011 letter is attached hereto as

Exhibit 7. In particular, the NYDFS concluded that "by increasing COI rates in a manner that is

inconsistent with the terms of the [policy]," and using "the funding ratio as a factor for a change

in the COI rates even though the [policy] does not include the funding ratio as a factor for any

change in COI rates," PLIC violated New York Insurance Law §§ 3201 and 3204(a)(1),

respectively. The NYDFS further stated that "it would be unreasonable to expect a policyholder

to conclude that the funding ratio of his or her policy is a factor that [PLIC] may use in a new

formula developed after policy issuance to increase COI rates." Thus, the NYDFS concluded

that the policy form on which the PLIC Policies were issued "violates Insurance Law

§§ 3102(c)(1)(A) and (B), which require that insurers write insurance policies in a clear and

coherent manner," and is also "inconsistent with Insurance Law § 3201(c)(1) because it is

misleading to the policyholder."[1] (Id.)

  43. The NYDFS also found that PLIC's advertising materials "are misleading and

misrepresent the benefits and advantages of the policies in violation of New York Insurance Law

---

[1] The NYDFS also determined that the PAUL policy form "violates Insurance Law § 4232(b)(2)" because it states that PLIC can base COI rates, "in part, upon . . . capital and reserve requirements and tax assumptions," which § 4232(b)(2) does not permit.

§§ 2123(a)(1) and 4226(a)(1) and 11 NYCRR Part 219 (Regulation 34-A)."  In particular, the NYDFS found that PLIC's "advertising materials make numerous statements emphasizing premium payment flexibility, but do not make any statements to the effect that a person's failure to fund the policy at a certain level may affect expectations with regard to future mortality, persistency, investment earnings, and expenses, thereby resulting in a COI rate increase."  (*Id.*)

44.     In response to the NYDFS's findings, PLIC agreed to rescind its 2010 COI rate increases for policies issued in New York only, including the PLIC Policies, but Phoenix has continued to implement these unlawful rate increases in every other state.

**F.     Phoenix Implements Another Unlawful COI Rate Increase in 2011**

45.     Undeterred by the regulatory determination that the 2010 COI rate increases were unlawful and discriminatory, Phoenix proceeded to implement another COI rate increase in 2011 on the same impermissible grounds.

46.     Specifically, on or after September 26, 2011, after the NYDFS issued its determination as to PLIC's improper 2010 rate increases, PHL began sending a new round of letters to policyholders notifying them that PHL was raising the COI rates on its policies, including the 111 PHL Policies here.  An example of these letters is attached hereto as Exhibit 8.

47.     Similarly, on or after November 23, 2011, PLIC also began sending letters to policyholders notifying them that, while PLIC was rescinding the 2010 COI rate increase that the NYDFS had determined to be unlawful (as explained above), it was "implementing a different [COI] rate increase" on its policies, including the four PLIC Policies at issue here.  An example of these letters is attached hereto as Exhibit 9.  Upon information and belief, while PLIC represented that it was implementing a "different" increase, its 2011 COI rate increase on the

PLIC Policies was based on substantially the same improper grounds as PHL's 2011 COI rate increase on the 111 PHL Policies.

48.     This time, Phoenix did not tell policyholders that the COI rate increase was based on "accumulated policy values."  In fact, Phoenix said very little at all about the increase.  Nor, again, did Phoenix say how much the increase would be or provide any factual or contractual basis for the increase, nor did it provide any documentary support for the increase.

49.     In fact, the 2011 COI rate increase on the PHL Policies and PLIC Policies was once again based on a policyholder's funding level—even though Phoenix strategically avoided disclosing that fact to policyholders.  While Phoenix attempted to make the new COI rate increases appear facially neutral, Phoenix intentionally structured the criteria for its rate increases to make sure that it would impact all minimum funders.  Phoenix simply disregarded the class of insureds that existed at policy inception and created an entirely new class of insureds based on policyholders' funding levels, rather than any underwriting or actuarial basis, in order to unfairly discriminate against those who maintained low policy values.

50.     Upon information and belief, all of the 2011 COI rate increases were part and parcel of Phoenix's scheme to jack up the COI rates on policyholders who exercised their right to maintain low policy values by paying only enough premiums to cover their monthly policy charges.  In other words, Phoenix continued to try to deprive policyholders of one of the essential benefits of their policies in clear violation of the express and implied terms of the Policies and applicable law.

51.     By basing its COI rate increases on funding levels and increasing rates only on those policyholders who exercised their right to maintain lower funding levels, Phoenix breached the Policies in a number of ways.  First, Phoenix breached the express terms of the Policies,

which provide that the COI rates will be changed based only on certain enumerated factors that include Phoenix's expectations of future mortality and persistency.  Accumulated value is not a factor on which COI rates can be based.  Funding level also is not a factor that permits Phoenix to change COI rates.

52.     Second, Phoenix breached the express terms of the Policies because the increase in the COI rates clearly discriminates unfairly within a class of insureds and also is not made on a uniform basis for all insureds in the same class.  Even within the group of people who received a COI rate increase, Phoenix discriminated by raising the COI rates only on those who chose to maintain lower accumulated policy values.  Phoenix's rate increase also violates applicable state anti-rate-discrimination laws, which prohibit an insurer from discriminating among individuals with the same life expectancy.  Here, Phoenix's rates discriminate against people, not based on their life expectancy, but on how they choose to fund their policies.

53.     Third, Phoenix breached the Policies by increasing the COI rates even though life expectancy is now greater.  The COI rates are supposed to represent the rates that Phoenix charges to cover the risk of paying the death benefit upon a mortality event.  These rates should be driven primarily by Phoenix's expectations of future mortality, and, given current mortality trends, those expectations could not possibly justify an increase in the COI rates.

54.     It is apparent that by increasing the COI rates based on accumulated policy values, Phoenix wants to force policyholders either to (a) pay exorbitant premiums that Phoenix knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their policies and forfeit the premiums they have paid, as evidenced by Phoenix's "shock lapse" analyses. Phoenix, in turn, will make a huge profit—either through higher premium payments or by

eliminating a large group of policies (through lapses or surrenders) and keeping the premiums that have been paid to date on these policies.

55.     In short, when policyholders exercised their right to fund premiums at their discretion and only as needed to cover their monthly charges, Phoenix singled out those policyholders by raising the COI rates on them.  This COI rate increase, which Phoenix applied to the Policies here, renders the concept of "flexible premiums" illusory.  Policyholders are forced to fund more premiums into their account than they otherwise would have, or else pay prohibitively high COI rates.  Phoenix has thus deprived policyholders of one of the most essential rights of universal life insurance—the right to manage and fund their policies according to their needs and desires.

56.     Phoenix's scheme also directly contradicts the representations Phoenix made in, and in conjunction with, the Policies.  Policyholders purchased their policies based on these representations, as well as Phoenix's rates.  By increasing the rates on policyholders after they had purchased their policies and when expectations of future mortality could not possibly justify such an increase, Phoenix has unequivocally repudiated these representations.  The COI rate is designed for policyholders to share in the legitimate risks associated with life insurance, not to give the insurance company unilateral power to destroy all the value in its policies simply to guarantee itself future profits.  Yet that is exactly what Phoenix is trying to do here.

57.     Furthermore, by raising future COI rates on existing policies after inducing policyholders to purchase their policies based on lower rates, even as Phoenix planned to raise those rates in the future, Phoenix has engaged in fraudulent, unfair, and deceptive trade practices.

## COUNT I

### (Breach of Contract – Express)

58.     Plaintiff realleges the allegations contained in paragraphs 1 through 57, inclusive, as if set forth fully here.

59.     The Policies are binding and enforceable contracts.

60.     Defendants materially breached the Policies in several respects, including but not limited to the following:

61.     Defendants breached the Policies by increasing the COI rates based on a policy's accumulated value because accumulated value is not one of the permissible and enumerated bases for increasing the COI rates.

62.     Defendants also breached the Policies by increasing the COI rates based on purported changes in expected funding levels because funding level is not one of the permissible and enumerated bases for increasing the COI rates.

63.     Defendants also breached the Policies because Defendants' increases in the COI rates were not based on the permissible factors stated in the Policies, such as Defendants' actual expectations of future mortality and persistency.

64.     Defendants also breached the Policies by increasing the COI rates only on certain policyholders and not on others because such increases discriminate unfairly within a class of insureds and are not made on a uniform basis for all insureds in the same class.

65.     Defendants also breached the Policies because, upon information and belief, Defendants' increases in the COI rates were designed to recoup past losses.

66.     Plaintiff has performed all of its obligations under the Policies, except to the extent that its obligations have been excused by Defendants' conduct as alleged herein.

67.     As a direct and proximate cause of Defendants' material breaches of the Policies, Plaintiff has been damaged as alleged herein in an amount to be proven at trial, but in any event in excess of $75,000, exclusive of interest and costs.

## COUNT II

**(Breach of Contract – Implied Covenant of Good Faith and Fair Dealing)**

68.     Plaintiff realleges the allegations contained in paragraphs 1 through 67, inclusive, as if set forth fully here.

69.     The Policies are binding and enforceable contracts.

70.     Each of the Policies issued by Defendants includes an implied covenant that Defendant will act in good faith and deal fairly with Plaintiff.

71.     Defendants materially breached this covenant in several respects, including but not limited to the following:

72.     Defendants breached the implied covenant of good faith and fair dealing by undermining Plaintiff's right to pay premiums solely as needed to cover monthly deductions, including the COI.  By increasing the COI rates on policyholders who exercised their contractual right to pay only enough premiums to cover the policy's monthly charges (including by basing the COI rates on a policy's accumulated value), Phoenix is, in effect, penalizing and deterring policyholders from exercising their contractual rights and is, thus, frustrating policyholders' right to one of the essential benefits of the policies.

73.     Defendants also breached the implied covenant of good faith and fair dealing by using increases in the COI rates to induce "shock lapses"—that is, making the Policies prohibitively expensive and trying to cause Plaintiff and other policyholders to lapse or surrender

their policies so that Defendants can keep the premiums and never have to pay the Policies' death benefits.

74.     Defendants also breached the implied covenant of good faith and fair dealing by failing to provide any meaningful disclosures about the COI rate increases, including Defendants' failure to identify the specific contractual provisions on which they were relying to increase the COI rates, failing to describe the alleged factual circumstances behind their raising of the COI rates, and refusing to provide or make available the documents that Defendants contend supported their alleged contractual and factual bases for raising the COI rates.

75.     Defendants also breached the implied covenant of good faith and fair dealing because Defendants intended to raise COI rates, but waited until after inducing the purchase of Defendants' policies before later raising the COI rates as they planned to do.

76.     Defendants also breached the implied covenant of good faith and fair dealing by using the COI rates as a device to manage their own profitability at the expense of their policyholders, including Plaintiff, and by imposing excessively high rate increases to accomplish that improper objective.

77.     Plaintiff has performed all of its obligations under the Policies, except to the extent that its obligations have been excused by Defendants' conduct as alleged herein.

78.     As a direct and proximate cause of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiff has been damaged as alleged herein in an amount to be proven at trial, but in any event in excess of $75,000, exclusive of interest and costs.

## COUNT III

**(Violations of the Connecticut Unfair Trade Practices Act)**

79.     Plaintiff realleges the allegations contained in paragraphs 1 through 78, inclusive, as if set forth fully here.

80.     The Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b(a), provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

81.     The Connecticut Unfair Insurance Practices Act ("CUIPA") prohibits unfair methods of competition and unfair and deceptive acts and practices in the insurance industry. *See* Conn. Gen. Stat. §§ 38a-815, *et seq*.

82.     Among other things, CUIPA prohibits:

a.     "Making, issuing or circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement, sales presentation, omission or comparison" which contains false or misleading statements, including misrepresentations as to the "benefits, advantages, conditions or terms of any insurance policy."  Conn. Gen. Stat. § 38a-816(1);

b.     "Making, publishing, disseminating, circulating or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated or placed before the public, . . . an adverstisement, announcement or statement containing any assertion, representation or statement with respect to the business of insurance . . . which is untrue, deceptive or misleading."  *Id.* § 38a-816(2);

c.     Any violation of various specified provisions, Conn. Gen. Stat. § 38a-816(9), including Conn. Gen. Stat. § 38a-446, which prohibits life insurance companies from

22

"mak[ing] or permit[ting] any distinction or discrimination in favor of individuals between insurants of the same class and expectation of life in the amount or payment of premiums or rates charged" for life insurance; and

> d.  Unfair claim settlement practices performed "with such frequency as to indicate a general business practice." *Id*. § 38a-816(6).

83.  Among the unfair or deceptive acts or practices alleged herein, Defendants (i) misrepresented the "benefits, advantages, conditions or terms" of their policies; (ii) intentionally disseminated deceptive and misleading policy illustrations misrepresenting the amount of premium necessary to keep their policies in force; and (iii) made, disseminated, or otherwise placed before the public statements "with respect to the business of insurance" which were "untrue, deceptive or misleading." *See id.* § 38a-816.   In addition, Defendants made or permitted a "distinction or discrimination in favor of individuals between insurants of the same class and expectation of life in the amount or payment of premiums or rates charged." *See id.* § 38a-446.

84.  In particular, in addition to the other false and misleading statements and misconduct described herein, Defendants represented that their universal life policies offer flexible premiums that would allow policyholders to fund only enough premiums to cover the monthly deductions, that Defendants would not raise the COI rates other than based on the enumerated factors stated in the Policies, and that Defendants would not raise the COI rates unless they did so for all insureds in a class.  Among other things, Defendants made those representations in, and in conjunction with, the Policies continuously throughout 2011 and thereafter.  Further, in and after 2011, Defendants also knowingly and intentionally issued false and misleading policy illustrations that inaccurately reported a policyholder's future COI

charges.  Upon information and belief, Defendants issued these false and misleading illustrations to overstate the future costs of the policies in order to induce policyholders to lapse or surrender their policies.  These and other statements made by Defendants were untrue, deceptive, and misleading, and Defendants knew, or by the exercise of reasonable care, should have known that the statements were untrue, deceptive or misleading.

85.    Defendants also engaged in unlawful rate discrimination by basing the payment or amount of premiums or COI rates and their rate increases on the way a policyholder funds his or her policy and by issue age and face amounts, as opposed to basing them on an insured's class and expectation of life.

86.    Defendants' unfair or deceptive acts or practices also violate CUIPA's prohibitions against unfair claim settlement practices.  Indeed, Defendants have engaged in unfair claim settlement practices with such frequency as to indicate a general business practice. In particular, by knowingly and intentionally issuing false and misleading policy illustrations that inaccurately reported a policyholder's future COI charges, and by improperly increasing COI rates, Defendants sought to induce policyholders to lapse or surrender their policies, and thereby sought to avoid the filing of any claims with respect to their policies.

87.    Defendants' unfair or deceptive acts or practices (described above) violate CUIPA, including without limitation the CUIPA sections described above, and thus violate CUTPA (among other applicable Connecticut laws).

88.    Specifically, by reason of the foregoing, Defendants' conduct has been unlawful or offended public policy as it has been established by statutes, the common law, or otherwise, and is within at least the penumbra of common-law, statutory, or another established concept of unfairness, and therefore constitutes an unfair or deceptive act or practice.

24

89.     Defendants' conduct also has been fraudulent, immoral, unethical, oppressive, or unscrupulous, and for that reason constitutes an unfair or deceptive act or practice.

90.     Defendants' conduct has also caused substantial injury to consumers, competitors, and/or other business persons or entities, including Plaintiff, and for that reason as well constitutes an unfair or deceptive act or practice.  The substantial injury inflicted by Defendants' conduct was and is not outweighed by any countervailing benefits to consumers or competition (because there is no such benefit), and reasonably could not have been and cannot be avoided by consumers, competitors, and/or other business persons or entities, including Plaintiff.

91.     Defendants' conduct also likely misled consumers, who acted reasonably when considering Defendants' foregoing statements and representations, and likely affected consumers' decisions or conduct.  For these reasons, Defendants' conduct constitutes an unfair or deceptive act or practice.

92.     As a direct and proximate cause of Defendants' unfair or deceptive acts or practices, which have resulted in an ascertainable loss of money or property to Plaintiff, Plaintiff has been damaged as alleged herein in an amount to be proven at trial, but in any event in excess of $75,000, exclusive of interest and costs.

93.     Because Defendants acted with a willful, reckless and/or wanton indifference to Plaintiff's rights, Defendants also are liable for punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

94.     Plaintiff also is entitled to recover its costs and reasonable attorneys' fees incurred in prosecuting this action pursuant to Conn. Gen. Stat. § 42-110g(d).

95.      In compliance with Conn. Gen. Stat. § 42-110g(c), a copy of this Amended Complaint is being mailed to the Attorney General of the State of Connecticut and the Connecticut Commissioner of Consumer Protection on this date.

## COUNT IV

### (Declaratory Relief)

96.      Plaintiff realleges the allegations contained in paragraphs 1 through 95, inclusive, as if set forth fully here.

97.      For reasons including, but not limited to, those stated herein, there exists an actual dispute and controversy between Plaintiff and Defendants concerning Plaintiff's rights and Defendants' obligations under the Policies, including but not limited to how Defendants must implement any change in the COI rates and under what circumstances Defendants may change the COI rates.

98.      Accordingly, Plaintiff seeks a declaration (a) that Defendants cannot base COI rates, or any changes to COI rates, on a policy's accumulated value, the ratio of accumulated value to its face amount, or on policy funding levels or funding patterns; (b) that Defendants' purported "class" of policies defined by issue age and face amount and/or accumulated value are improper classes; and (c) setting forth the specific guidelines that govern the factual circumstances under which Defendants can raise the COI rates.

99.      Such a declaration will help prevent or limit any future controversies under the Policies by providing guidance as to when and how Defendants can change the COI rates.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

**On Count I**

1.      For damages in an amount to be determined at trial, including but not limited to all overcharges or excessive charges;

2.      For an award of pre-judgment and post-judgment interest;

3.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.      For such other and further relief as the Court may deem proper.

**On Count II**

5.      For damages in an amount to be determined at trial, including but not limited to all overcharges or excessive charges;

6.      For an award of pre-judgment and post-judgment interest;

7.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

8.      For such other and further relief as the Court may deem proper.

**On Count III**

9.      For damages in an amount to be determined at trial, including but not limited to all overcharges or excessive charges;

10.      For an award of prejudgment and post-judgment interest;

11.      For the costs of the suit herein incurred and reasonable attorneys' fees;

12.      For an award of punitive damages;

13.      For an injunction (a) prohibiting Defendants from implementing and enforcing their COI rate increases, requiring Defendants to rescind the increases and return all excess

premiums received, and reinstating any lapsed or surrendered policies; and (b) prohibiting Defendants from basing COI rates, or any changes to COI rates, on a policy's accumulated value, the ratio of a policy's accumluated value to its face amount, or on policy funding levels or funding patterns; and

14. For such other and further relief as the Court may deem proper.

## On Count IV

15. For a declaration (a) that Defendants cannot base COI rates, or any changes to COI rates, on a policy's accumulated value, the ratio of a policy's accumluated value to its face amount, or on policy funding levels or funding patterns; (b) that Defendants' purported "classes" of policies defined by issue age and face amount and/or accumulated value are improper classes; and (c) setting forth the specific guidelines that govern the factual circumstances under which Defendants can raise the COI rates.

16. For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

17. For such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure.

Dated: October 16, 2014

By: _/s/ Allan J. Arffa_____
    Martin Flumenbaum (admitted *pro hac vice*)
    Allan J. Arffa (admitted *pro hac vice*)
    Jessica S. Carey (admitted *pro hac vice*)
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990
E-mail:  mflumenbaum@paulweiss.com
        aarffa@paulweiss.com
        jcarey@paulweiss.com

    -and-

James I. Glasser (ct07221)
Kevin M. Smith (ct24774)
**Wiggin and Dana LLP**
One Century Tower
265 Church Street, P.O. Box 1832
New Haven, CT  06508-1832
Tel: (203) 498-4313
Fax: (203) 782-2889
E-mail:  jglasser@wiggin.com
        ksmith@wiggin.com

*Attorneys for Plaintiff U.S. Bank National Association,*
*as securities intermediary for Lima Acquisition LP*

## CERTIFICATE OF SERVICE

I hereby certify that, on October 16, 2014, a copy of the foregoing **AMENDED COMPLAINT** was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

This filing has also been sent by Federal Express to counsel for defendants PHL Variable Insurance Company and Phoenix Life Insurance Company:

> Thomas F.A. Hetherington
> Edison, McDowell & Hetherington LLP
> 3200 Southwest Freeway, Suite 2100
> Houston, TX  77027

> /s/ Allan J. Arffa
> Allan J. Arffa
> **Paul, Weiss, Rifkind, Wharton & Garrison LLP**
> 1285 Avenue of the Americas
> New York, NY 10019-6064
> Tel: (212) 373-3203
> E-mail:  aarffa@paulweiss.com

30